IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| CATHERINE SANDERS, surviving spouse of Charles E. Sanders, deceased, and on behalf of the wrongful death beneficiaries of Charles E. Sanders,<br><br>        Plaintiff,<br><br>v.<br><br>ALLENBROOKE NURSING AND REHABILITATION CENTER, LLC, d/b/a ALLENBROOKE NURSING AND REHABILITATION CENTER; AURORA CARES, LLC; DTD HC, LLC; D&N, LLC; DONALD T. DENZ; and NORBERT A. BENNETT,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  No. 2:20-cv-02001<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

ORDER

This is a health care liability suit alleging a wrongful death.  Before the Court is Defendant Allenbrooke Nursing and Rehabilitation Center, LLC's ("Allenbrooke") March 6, 2020 Motion to Compel Arbitration and Stay Proceedings (the "Motion to Compel").  (ECF No. 15.)  Plaintiff Catherine Sanders ("Catherine" or "Sanders"), surviving spouse of Charles E. Sanders, and on behalf of the wrongful death beneficiaries of

Charles E. Sanders, responded on March 17, 2020.  (ECF No. 21.)
Allenbrooke replied on April 10, 2020.  (ECF No. 29.)

For the following reasons, the Motion to Compel is DENIED.

## I.   Background

Charles E. Sanders ("Charles") was a resident of Allenbrooke
from about December 7, 2018, to January 2, 2019.  (ECF No. 1
¶ 2.)  When Charles was admitted, Catherine, his wife, signed an
Appointment of Surrogate form.  (ECF No. 15-3; ECF No. 15-4.)
On the Appointment of Surrogate form, Catherine represented that:

> I accept the appointment as surrogate for this Resident
> and understand I have the authority to make all health
> care related decisions for [Charles] including the
> signing of an arbitration agreement.[1]

(ECF No. 15-3.)  Catherine signed the Appointment of Surrogate
form on December 7, 2018.  (Id.)

On or around December 14, 2018, Charles's designated
physician, Dr. Dana Nash, completed the physician portion of the
Appointment of Surrogate form.[2]  (Id.)  On the physician portion
of the Appointment of Surrogate form, Dr. Nash represented that:

> I find that the Resident . . . lacks capacity . . . to
> understand the significant benefits, risks, and
> alternatives to proposed health care and to make and
> communicate a health care decision.  I agree with the

---

[1] On the page of the Appointment of Surrogate form that Catherine
signed, the "Name of Resident" field was left blank.  (ECF No. 15-
3.)  The first page of the form states that "Catherine Sanders is
designated as surrogate for Charles Sanders."  (ECF No. 15-4.)

[2] Dr. Nash's handwriting on the Appointment of Surrogate form is not
entirely legible.  (See ECF No. 15-3.)  She appears to have written
"12/14/18" in the "Date" line next to her signature.  (See id.)

decision to appoint this surrogate.  It is my opinion
that this is true both on the day the surrogate
accepted the appointment and today.  It is my intention
that the designation of surrogate is effective back to
the date of acceptance by the surrogate, so that
healthcare decisions made by the surrogate for the
resident back to that day are valid.

(Id.)

On December 7, 2018, Catherine signed a Resident and
Facility Arbitration Agreement (the "Agreement").  (ECF No. 15-
2.)  Catherine signed the Agreement on Charles's behalf as his
"Family Member or other Representative."  (Id. at 3.)  Charles
did not sign the Agreement.  (See id.)  The Agreement provides
that:

Any and all disputes between the Resident and the
Facility shall be submitted to binding arbitration
where the amount in controversy exceeds $25,000.  This
includes any disputes arising out of or in any way
relating to this Agreement (its enforceability), the
Admission Agreement, or any of the Resident's stays at
the Facility, whether existing or arising in the
future, whether for statutory, compensatory or
punitive damages, and irrespective of the legal
theories upon which the claim is asserted.

(Id. ¶ 3.)

The Agreement defines Charles as the "Resident" and
Allenbrooke as the "Facility."  (Id. at 1.)  It states that
"[t]he term 'Resident' shall refer collectively to those signing
with or for the Resident."  (Id. ¶ 2.)  It states that "[a]
person signing who routinely makes decisions for the Resident,
if not the Power of Attorney or Guardian/Conservator, will be

3

considered a health care surrogate/proxy and/or Legal Representative." (Id.)   It states that "[t]he Resident will be considered to be a third party beneficiary of this Agreement and is intended to benefit directly from the execution of this Agreement in conjunction with the corresponding admission(s) and receipt of services." (Id.)   The Agreement states that:

> It is the intention of the parties that this Agreement . . . shall inure to the benefit of and bind the Resident, his/her successors, assigns, agents, attorneys, third party beneficiaries, insurers, heirs, trustees and representatives, including the personal representative or executor of the estate, the spouse, children, granchildren, all decedents and next friends, and any person whose claim is derived through the Resident.

(Id. ¶ 5.)

On or around January 2, 2019, Charles was transferred from Allenbrooke to St. Francis Hospital.   (ECF No. 1 ¶ 2.)   On January 4, 2019, Charles died at the hospital.   (Id.)

On January 3, 2020, Sanders filed the Complaint in this action.   (ECF No. 1.)   As Charles's surviving spouse, and on behalf of Charles's wrongful death beneficiaries, Sanders asserts statutory negligence, common law negligence, and survival and wrongful death claims against Allenbrooke and the other defendants.[3]   (See id. ¶¶ 40-63.)

---

[3] In Tennessee, a "right of action that the decedent would have had, but for death, is not extinguished but instead passes to the surviving spouse or, if there is no spouse, to the decedent's children or next of kin." Beard v. Branson, 528 S.W.3d 487, 498 (Tenn. 2017).   "[I]n a wrongful death lawsuit, the surviving spouse

On March 6, 2020, Allenbrooke filed the Motion to Compel. (ECF No. 15.)  Allenbrooke argues that the Agreement requires arbitration of Sanders's claims.  (Id.)  Allenbrooke asks the Court to compel arbitration and stay proceedings pending resolution of arbitration.  (Id.)

## II.  Jurisdiction and Choice of Law

The Court has diversity jurisdiction.  28 U.S.C. § 1332. The amount in controversy exceeds $75,000.  Sanders seeks compensatory and punitive damages for negligence and survival and wrongful death claims against multiple defendants.  (ECF No. 1 ¶¶ 46, 56, 58-66.)

The parties are completely diverse.  Catherine Sanders is a resident citizen of Tennessee.  (ECF No. 44 ¶ 2.)  None of the Defendants is a citizen of Tennessee.  Allenbrooke is a Tennessee limited liability company.  (Id. ¶ 6.)  Aurora Cares, LLC is a New York limited liability company.  (Id. ¶ 8.)  For purposes of diversity jurisdiction, limited liability companies have the citizenship of each of their members.  Americold Realty Tr. v. Conagra Foods, Inc., 136 S. Ct. 1012, 1015 (2016) (citing Carden v. Arkoma Assocs., 494 U.S. 185, 195-96 (1990)); accord Delay v. Rosenthal Collins Grp., LLC, 585 F.3d 1003, 1005 (6th Cir. 2009).

---

asserts his own right of action for his own benefit and for the benefit of the other statutory beneficiaries who share in any recovery." Id. at 503.

5

The members of Allenbrooke and Aurora Cares, LLC are DTD HC, LLC and D&N LLC.  (ECF No. 44 ¶¶ 7, 9.)  DTD HC, LLC and D&N LLC are New York limited liability companies.  (Id. ¶¶ 10, 13.)  DTD HC, LLC's members are Donald T. Denz and the Donald T. Denz Irrevocable Trust.  (Id. ¶ 14.)  Donald T. Denz is a resident citizen of New York.  (Id. ¶ 17.)  The citizenship of a traditional trust is that of its trustee.  See GBForefront, L.P. v. Forefront Mgmt. Grp., LLC, 888 F.3d 29, 38-40 (3d Cir. 2018). The trustee of the Donald T. Denz Irrevocable Trust is Martin Clifford, who is a resident citizen of New York.  (ECF No. 44 ¶ 15.)  D&N, LLC's members are Norbert A. Bennett, the Norbert A. Bennett Children's Trust, and the Norbert A. Bennett Grandchildren's Trust.  (Id. ¶ 11.)  Norbert A. Bennett is a resident citizen of New York.  (Id. ¶ 17.)  The trustee of the Norbert A. Bennett Children's Trust and the Norbert A. Bennett Grandchildren's Trust is Ronald Bennett, who is a resident citizen of New York.  (Id. ¶ 12.)

The Court has diversity jurisdiction because the parties are completely diverse and the amount in controversy exceeds $75,000.  28 U.S.C. § 1332.

Federal courts sitting in diversity apply state law to issues of substantive law and federal law to procedural issues. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78-80 (1938); see also Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 427 (1996).

Under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1, et seq., courts "apply[] general state-law principles of contract interpretation to the interpretation of an arbitration agreement within the scope of the Act." Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ., 489 U.S. 468, 475 (1989) (citing Perry v. Thomas, 482 U.S. 483, 493 n.9 (1987)). When there is no dispute that a certain state's substantive law applies, the court need not conduct a choice-of-law analysis sua sponte. See GJB Corp. v. E. Ohio Paving Co., 139 F.3d 1080, 1085 (6th Cir. 1998). The parties assume that Tennessee substantive law governs the Agreement. The Court will apply Tennessee substantive law.

## III. Standard of Review

When there is a written agreement to arbitrate and one party refuses to arbitrate, the other party may petition the district court to order the refusing party to comply with the terms of the agreement. See 9 U.S.C. § 4. "When asked by a party to compel arbitration under a contract, a federal court must determine whether the parties agreed to arbitrate the dispute at issue." Stout v. J.D. Byrider, 228 F.3d 709, 714 (6th Cir. 2000) (citing Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985)).

The FAA favors arbitration. Albert M. Higley Co. v. N/S Corp., 445 F.3d 861, 863 (6th Cir. 2006). "[C]ourts are to

7

examine the language of the contract in light of the strong federal policy in favor of arbitration. Likewise, any ambiguities in the contract or doubts as to the parties' intentions should be resolved in favor of arbitration." Great Earth Cos. v. Simons, 288 F.3d 878, 889 (6th Cir. 2002) (quotation marks and citation omitted). Under the FAA, "a written agreement to arbitrate disputes arising out of a contract involving interstate commerce 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" Id. (quoting 9 U.S.C. § 2). An arbitration agreement can be invalidated for the reasons for which any contract can be invalidated, such as "fraud, duress, or unconscionability." Fazio v. Lehman Bros., Inc., 340 F.3d 386, 393, 396 (6th Cir. 2003).

The showing necessary to compel arbitration absent trial is the same as the showing necessary for summary judgment in a civil action. See Great Earth Cos., 288 F.3d at 889 (citing Doctor's Assocs., Inc. v. Distajo, 107 F.3d 126, 129-30 (2d Cir. 1997)). The movant bears the burden to establish the existence of "a binding agreement to arbitrate." In re First Thermal Sys., Inc., 182 B.R. 510, 513 (Bankr. E.D. Tenn. 1995). If that showing is made, the burden shifts to the nonmovant to demonstrate that the validity of the agreement is "in issue." Great Earth Cos., 288 F.3d at 889. To show that the validity of an arbitration

agreement is "in issue," "the party opposing arbitration must show a genuine issue of material fact as to the validity of the agreement to arbitrate." Id.

## IV. Analysis

The parties dispute whether there is a valid arbitration agreement that requires arbitration of Sanders's claims. (ECF No. 15-1 at 4-8; ECF No. 21 at 7-16.)  The parties dispute whether that issue should be decided by the Court or an arbitrator.  (ECF No. 15-1 at 8-9; ECF No. 21 at 5-7.) Allenbrooke asks the Court to allow the parties to conduct limited discovery on issues relating to arbitration.  (ECF No. 29 at 7-8.)

### A. Arbitrability

The parties dispute whether the Court or an arbitrator should decide whether there is a valid arbitration agreement that requires arbitration of Sanders's claims.  Allenbrooke argues that an arbitrator must decide that issue.  (ECF No. 15-1 at 8-9.)  Sanders argues that it is an issue for the Court. (ECF No. 21 at 5-7.)

When a party moves to compel arbitration, the court must resolve issues of "arbitrability," i.e., "any issue that calls into question the formation or applicability of the specific arbitration clause that a party seeks to have the court enforce." Granite Rock Co. v. Int'l Brotherhood of Teamsters, 561 U.S.

287, 297-98 (2010) (citing <u>Rent-A-Center, West, Inc. v. Jackson</u>, 561 U.S. 63, 68-70 (2010)).  "[T]hese issues typically concern the scope of the arbitration clause and its enforceability," as well as "whether the clause was agreed to" and "when that agreement was formed." <u>Id.</u>  "When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." <u>First Options of Chi., Inc. v. Kaplan</u>, 514 U.S. 938, 944 (1995).

Some arbitration agreements contain clauses in which the parties agree that certain "gateway" questions of arbitrability will be decided by an arbitrator and not by a court. <u>See Rent-A-Center</u>, 561 U.S. at 68-69.  Those clauses are known as "delegation provision[s]." <u>Id.</u> at 68.  Arbitration agreements often contain delegation provisions providing that disputes about the "validity" or "enforceability" of the agreement will be decided by an arbitrator.[4] <u>See, e.g.</u>, <u>id.</u> (discussing

---

[4] In FAA case law, courts use the terms "valid" and "validity" in different ways in different contexts.  Sometimes, courts use those terms to refer to a court's overarching inquiry into whether there is a legally enforceable arbitration agreement. <u>See, e.g.</u>, <u>Great Earth Cos.</u>, 288 F.3d at 888-90.  At other times, courts draw a finer distinction between the concepts of contract validity and contract formation. <u>See</u> <u>Buckeye Check Cashing, Inc. v. Cardegna</u>, 546 U.S. 440, 444 & n.1 (2006) (distinguishing the issue of contract "validity," <u>e.g.</u>, whether "the illegality of one of the contract's provision renders the whole contract invalid," from the issue of "whether any agreement between the alleged obligor and obligee was ever concluded").

delegation provision that assigned disputes about the "enforceability" of an arbitration agreement to an arbitrator); Zawada v. Uber Techs., Inc., No. 16-cv-11334, 2016 WL 7439198, at *3 (E.D. Mich. Dec. 27, 2016) (discussing delegation provision that assigned disputes about the "enforceability, revocability, or validity" of an arbitration agreement to an arbitrator).

The Agreement contains a delegation provision. It states that the "Resident and the Facility" agree to arbitrate "any disputes arising out of or in any way relating to this Agreement (its enforceability) . . . ." (ECF No. 15-2 ¶ 3.) Allenbrooke argues that the Agreement's delegation provision requires an arbitrator to determine whether the Agreement is a valid arbitration agreement. (ECF No. 15-1 at 8-9; ECF No. 29 at 1-5.)

Sanders argues that her claims do not have to be arbitrated because no agreement to arbitrate was formed. (See ECF No. 21 at 5-7.) Notwithstanding the Agreement's delegation provision, Sanders argues the issue is for the Court to decide. (See id.) Sanders's argument is well-taken. Even where an arbitration agreement contains a delegation provision, the antecedent question of whether an agreement to arbitrate was formed is a question for the court. See Granite Rock, 561 U.S. at 296 ("It is [] well settled that where the dispute at issue concerns contract formation, the dispute is generally for courts to

decide."); Henry Schein, Inc. v. Archer and White Sales, Inc., 139 S. Ct. 524, 530 (2019) (although "parties may delegate threshold arbitrability questions to the arbitrator," "before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists"); In re Auto. Parts Antitrust Litig., 951 F.3d 377, 383 (6th Cir. 2020) ("'[N]o matter how strong the federal policy favors arbitration, arbitration is a matter of contract between the parties, and one cannot be required to submit to arbitration a dispute which it has not agreed to submit to arbitration.'") (quoting Simon v. Pfizer Inc., 398 F.3d 765, 775 (6th Cir. 2005)).

Allenbrooke argues that the parties dispute whether the Agreement is valid or enforceable and not whether an arbitration agreement was formed. (ECF No. 29 at 2-5.) In the arbitration context, contract validity and contract formation are distinct issues. Validity is about whether an agreement that was made "is legally binding." In re Auto. Parts Antitrust Litig., 951 F.3d at 385 (citing Rent-A-Center, 561 U.S. at 69 n.1, 71 & n.2). Formation is about whether an agreement was "in fact agreed to" or "was ever concluded." Id. (citing Granite Rock, 561 U.S. at 299-300).

The parties dispute whether Catherine had the authority to sign the Agreement on Charles's behalf. (ECF No. 15-1 at 6-7; ECF No. 21 at 9-14.) That dispute raises a formation issue.

12

The United States Supreme Court has characterized whether a signatory has the authority to bind a nonsignatory principal as a formation question. See Buckeye, 546 U.S. at 444 n.1 (characterizing "whether the signor lacked authority to commit the alleged principal" as an issue about "whether any agreement between the alleged obligor and obligee was ever concluded"); Granite, 561 U.S. at 303 n.9 (characterizing this issue as a "formation dispute[]") (citing Buckeye, 546 U.S. at 444 n.1). Tennessee case law is in accord. See Edwards v. Allenbrooke Nursing and Rehab. Ctr., LLC, No. W2016-02553-COA-R3-CV, 2017 WL 4861658, at *3-4 (Tenn. Ct. App. Oct. 26, 2017) (holding that "issues regarding the signor's lack of authority to bind the principal" in arbitration agreement between resident and nursing facility were formation issues for the trial court to decide).

The parties dispute whether an agreement was formed between Catherine and Allenbrooke when Catherine signed the Agreement. (ECF No. 15-1 at 8-9; ECF No. 21 at 15-16.) That dispute raises a formation question: whether an agreement is formed between an agent signatory and a counterparty when the signatory purports to sign on a principal's behalf but lacks the authority to do so. See Ricketts v. Christian Care Ctr. of Cheatham Cnty., Inc., No. M2007-02036-COA-R9-CV, 2008 WL 3833660, at *4-5 (Tenn. Ct. App. Aug. 15, 2008) (considering whether "there was a contract between" signatory and nursing facility where signatory

purported to sign arbitration agreement on her mother's behalf but lacked authority to do so); see also Jones v. Allenbrooke Nursing and Rehab. Ctr. LLC, No. W2019-00448-COA-R3-CV, 2019 WL 6842372, at *6 (Tenn. Ct. App. Dec. 16, 2019) (same).

The Court must decide whether Catherine had the authority to sign the Agreement on Charles's behalf and whether an arbitration agreement was formed between Catherine and Allenbrooke when Catherine signed the Agreement. Those are questions about whether an arbitration agreement was formed. They are questions for the Court.

**B.   Formation**

The parties dispute whether an arbitration agreement was formed that requires the arbitration of Sanders's claims. (ECF No. 15-1 at 4-8; ECF No. 21 at 7-16.)

Allenbrooke argues that Catherine had the authority to enter into the Agreement on Charles's behalf; that there is a valid arbitration agreement between Charles and Allenbrooke; and that Catherine's causes of action as Charles's surviving spouse must be arbitrated. (ECF No. 15-1 at 6-7.) Alternatively, Allenbrooke argues that there is a valid arbitration agreement between Catherine and Allenbrooke that requires the arbitration of Catherine's causes of action. (Id. at 8-9.) Allenbrooke also argues that Catherine's causes of action must be arbitrated

14

because Charles is a third-party beneficiary of the Agreement. (ECF No. 29 at 5-7.)

### 1.  Agreement with Charles

Allenbrooke argues that Catherine had the authority to enter into the Agreement on Charles's behalf and that there is a valid arbitration agreement between Charles and Allenbrooke that requires arbitration of Catherine's causes of action.  (ECF No. 15-1 at 6-7.)

By its terms, the Agreement is a contract between Charles, the "Resident," and Allenbrooke, the "Facility."  (ECF No. 15-2.)  The Agreement provides that it "shall inure to the benefit of and bind the Resident, his/her successors, assigns, agents, attorneys, third party beneficiaries, insurers, heirs, trustees and representatives, including . . . the [Resident's] spouse . . . ."  (Id. ¶ 5.)  Charles did not sign the Agreement.  (See id. at 3.)  Catherine signed the Agreement on Charles's behalf as a "Family Member or other Representative."  (Id.)

Whether Catherine had the authority to enter into the Agreement on Charles's behalf is a question of statutory law. Allenbrooke argues that Catherine had the authority to sign the Agreement on Charles's behalf as his health care surrogate under the Tennessee Health Care Decisions Act ("THCDA"), Tenn. Code Ann. §§ 68-11-1801, et seq.  (ECF No. 15-1 at 6-7.)  The THCDA provides for the appointment of a health care surrogate vested

with the authority to make health care decisions for an incapacitated person. <u>See</u> Tenn. Code Ann. § 68-11-1806(b)-(c). The THCDA provides that:

> A surrogate may make a health care decision for a patient who is an adult or emancipated minor, if, and only if:
>
>> (1) The patient has been determined by the designated physician to lack capacity; and
>>
>> (2) No agent or guardian has been appointed or the agent or guardian is not reasonably available.

<u>Id.</u> § 68-11-1806(b).[5] "[T]he patient's surrogate shall be identified by the supervising health care provider and documented in the current clinical record of the institution or institutions at which the patient is then receiving health care." <u>Id.</u> § 68-11-1806(c)(1). "In the event of a challenge, there shall be a rebuttable presumption that the selection of the surrogate was valid. Any person who challenges the selection shall have the burden of proving the invalidity of that selection." <u>Id.</u> § 68-11-1806(c)(6).

Allenbrooke asserts that Dr. Nash, Charles's designated physician, appointed Catherine as Charles's health care surrogate. (ECF No. 15-1 at 6-7.) Catherine does not dispute

---

[5] A "designated physician" is "a physician designated by an individual or the individual's agent, guardian, or surrogate, to have primary responsibility for the individual's health care or, in the absence of a designation or if the designated physician is not reasonably available, a physician who undertakes such responsibility." Tenn. Code Ann. § 68-11-1802(a)(4).

16

that, when she signed the Agreement, Dr. Nash was Charles's designated physician.   Catherine argues that Dr. Nash's appointment of her as Charles's health care surrogate was not effective until after she had signed the Agreement, and that, under the THCDA, she did not have the authority to enter into the Agreement on Charles's behalf when she signed it.  (ECF No. 21 at 9-14.)

Catherine's argument is well-taken.  The record shows that Catherine signed the Appointment of Surrogate form and the Agreement on December 7, 2018.  (ECF No. 15-2 at 3; ECF No. 15-3.)  On or around December 14, 2018, Dr. Nash completed the physician portion of the Appointment of Surrogate form, in which she represented that Charles "lacks capacity" and that she "agree[d] with the decision to appoint this surrogate."  (ECF No. 15-3.)  Catherine has submitted an affidavit, in which she swears that "[n]o physician was present, and no physician signed the attached 'Appointment of Surrogate Form,' when I was presented with the stack of [Allenbrooke admission] documents to sign," and that, "[t]o my knowledge, Dr. Dana Nash never examined my husband prior to his admission to Allenbrooke on or about December 7, 2018."  (ECF No. 21-1 ¶¶ 6, 9.)  Allenbrooke does not dispute that Dr. Nash completed the physician portion of the Appointment of Surrogate form after December 7, 2018.

Allenbrooke argues that the THCDA does not require a patient's designated physician to have determined that the patient lacked capacity before the patient's health care surrogate may make a health care decision for the patient. (ECF No. 29 at 8.)  That argument does not comport with the statute or interpreting case law.  The THCDA provides an order of operations for the appointment of a health care surrogate.  It provides that "[a] surrogate may make a health care decision for a patient . . . if, and only if . . . [t]he patient <u>has been</u> determined by the designated physician to lack capacity . . . ." Tenn. Code Ann. § 68-11-1806(b) (emphasis added).  The Tennessee Court of Appeals has understood the THCDA to require that a patient be determined by his or her designated physician to lack capacity before someone else may make a decision for the patient as a health care surrogate.  <u>See</u> <u>Barbee v. Kindred Healthcare Operating, Inc.</u>, No. W2007-00517-COA-R3-CV, 2008 WL 4615858, at *11-12 (Tenn. Ct. App. Oct. 20, 2008) (decedent's son did not have authority to enter into arbitration agreement with nursing facility on decedent's behalf as health care surrogate under the THCDA because, <u>inter alia</u>, "nothing in the record indicat[ed] that at the time of the Decedent's admission any physician had made the requisite determination that the Decedent lacked [] capacity . . .") (emphasis omitted); <u>McKey v. Nat'l Healthcare Corp.</u>, No. M2007-02341-COA-R3-CV, 2008 WL 3833714, at *3 (Tenn.

Ct. App. Aug. 15, 2008) (the THCDA requires that "certain conditions be met in order to authorize a surrogate to act on behalf of the patient," including "a prior determination by the designated physician that the patient lacks capacity").  The THCDA "affects a person's fundamental right to personal autonomy," and "it is essential that the requirements of the [THCDA] be met before a person can be deprived of the right to make his or her own health care decisions." McKey, 2008 WL 3833714, at *5.

When Catherine signed the Agreement, Charles's designated physician had not determined that Charles lacked capacity. Catherine did not have the authority to enter into the Agreement on Charles's behalf as his health care surrogate when she signed the Agreement.  No arbitration agreement was formed between Charles and Allenbrooke.

### 2.   Agreement with Catherine

Allenbrooke argues that there is a valid arbitration agreement between Catherine and Allenbrooke that requires the arbitration of Catherine's causes of action. (ECF No. 15-1 at 8-9; ECF No. 29 at 2-5.)

The question is whether, in the absence of a valid arbitration agreement between Charles and Allenbrooke, an arbitration agreement was formed between Catherine and Allenbrooke when Catherine signed the Agreement.  The Agreement

is between the "Resident" and the "Facility."  (ECF No. 15-2.)
The Agreement defines Charles as the "Resident," and provides
that "'Resident' shall refer collectively to those signing with
or for the Resident."  (Id. ¶ 2.)  Allenbrooke argues that the
Agreement binds Catherine because she signed the Agreement "with
or for" Charles.  (ECF No. 29 at 2-5.)  Catherine did not sign
the Agreement "with" Charles.   Charles did not sign the
Agreement.   The question is whether Catherine signed the
Agreement "for" Charles.   "For," in this context, takes the
meaning "on behalf of" or "representing."  See Merriam-Webster
Online  Dictionary,  www.merriam-webster.com/dictionary/for.
Catherine  purported  to  sign  the  Agreement  as  Charles's
representative, but lacked the authority to do so.

Tennessee case law has addressed this issue and resolved it
in Catherine's favor.  See In re Auto. Parts Antitrust Litig.,
951 F.3d at 381 (when determining whether there is a valid
arbitration  agreement,  courts  "'apply  ordinary  state-law
principles that govern the formation of contracts'") (quoting
First Options of Chi., 514 U.S. at 944).  In Ricketts, the
Tennessee  Court  of  Appeals  considered  a  defendant  nursing
facility's  argument  that  an  arbitration  agreement  between  a
decedent  resident  and  the  defendant  that  was  signed  by  the
decedent's  daughter  on  the  decedent's  behalf  was  enforceable
against  the  decedent,  notwithstanding  the  daughter's  lack  of

authority to enter into the arbitration agreement on the decedent's behalf, because the arbitration agreement was a "contract between the family member and the nursing home, with the resident being a third party beneficiary of the contract." 2008 WL 3833660, at *4.  The court rejected that argument.  It held that the daughter, who "signed the admission agreement as [the decedent's] 'representative,'" was "not entering into a contract on her own behalf, but as her mother's representative." Id. at *4.  The court stated that the only contract formation issue in the case was "whether [the daughter] had authority to act as her mother's agent and to enter into a contract on her behalf.  If she did not have authority, there is no valid contract."  Id.

In Jones, the defendant asserted a third-party beneficiary argument similar to that made by the defendant facility in Ricketts.  2019 WL 6842372, at *6.  The arbitration agreement at issue in Jones had been signed by the daughter of a decedent resident.  Id. at *1.  The daughter signed the arbitration agreement as the decedent's representative, but lacked the authority to enter into the arbitration agreement on the decedent's behalf.  Id. at *1, 3-5.  After the decedent died, the daughter, as the decedent's next friend, brought negligence claims against the facility.  Id. at *2.  The arbitration agreement at issue in Jones, like the Agreement in this case,

21

was between the "Resident" and the "Facility," and provided that "'Resident' shall refer collectively to those signing with or for the Resident." (See ECF No. 21-3 ¶ 2.) The court held that, because the daughter lacked the authority to bind the decedent to the arbitration agreement, "no valid contract" was formed between the daughter and the facility. 2019 WL 6842372, at *6.

Ricketts and Jones are applicable precedents here. They establish that, because no arbitration agreement was formed between Charles and Allenbrooke, no arbitration agreement was formed between Catherine and Allenbrooke, notwithstanding the Agreement's language purporting to bind to arbitration the claims of persons signing "with or for" Charles. Allenbrooke cites no applicable precedents to the contrary. No arbitration agreement was formed between Catherine and Allenbrooke.

### 3.   Third-Party Beneficiary

Allenbrooke argues that Charles is a third-party beneficiary of the Agreement and therefore that Catherine's causes of action as Charles's surviving spouse must be arbitrated. (ECF No. 29 at 5-7.)

"Generally, contracts are presumed to be 'executed for the benefit of the parties thereto and not third persons.'" Owner-Operator Indep. Drivers Ass'n, Inc. v. Concord EFS, Inc., 59 S.W.3d 63, 68 (Tenn. 2001) (quoting Oman Constr. Co. v. Tenn. Cent. Ry. Co., 370 S.W.2d 563, 572 (Tenn. 1963)). There is an

22

exception to that rule when "the contracting parties express an intent that the benefits of the contract flow to a third party." Id.  Third-party beneficiaries may "enforce a contract if they are intended beneficiaries of the contract." Id.  In Tennessee, "a third party is an intended third-party beneficiary of a contract, and thus entitled to enforce the terms of a contract, where (1) the parties to the contract have not otherwise agreed, (2) recognition of the third-party's right to performance is appropriate to effectuate the parties' intent, and (3) terms or circumstances indicate that performance of the promise is intended or will satisfy an obligation owed by the promisee to the third party." Benton v. Vanderbilt Univ., 137 S.W.3d 614, 618 (Tenn. 2004) (citing Owner-Operator Indep. Drivers Ass'n, 59 S.W.3d at 70).

Charles is not a third-party beneficiary of the Agreement. There can be no third-party beneficiary of an agreement that does not exist.  See Ricketts, 2008 WL 3833660, at *4 ("Third party beneficiary concepts should not be used to circumvent the threshold requirement that there be a valid arbitration agreement.").  As discussed above, no arbitration agreement was formed between Catherine and Allenbrooke.  The Tennessee Court of Appeals has rejected the precise argument Allenbrooke

asserts.[6]   See   id.   at *4-5 (decedent was not third-party
beneficiary of arbitration agreement signed by decedent's
daughter on decedent's behalf where daughter lacked authority to
bind decedent to arbitration and "no valid contract" was formed
between nursing facility and daughter); Jones, 2019 WL 6842372,
at *6 (same).  Charles was not a third-party beneficiary of the
Agreement.  Catherine's causes of action are not required to be
arbitrated under that theory.

Because no arbitration agreement was formed between
Allenbrooke and Charles or Catherine, the Agreement does not
require arbitration of Catherine's causes of action.

### C.  Limited Discovery

Allenbrooke asks the Court to allow the parties to conduct
limited discovery on issues relating to arbitration.  (ECF No.
29 at 7-8.)  Allenbrooke asserts that limited discovery is
appropriate to "determine the extent of [Charles's] capacity

---

[6] Allenbrooke asserts that, in two prior orders, this Court has
determined that an arbitration agreement signed by a representative
of a nursing home resident on the resident's behalf "must be
enforced under a third-party beneficiary theory."  (See ECF No. 15-1
at 9 n.2) (citing Foley v. Allenbrooke Nursing and Rehab. Ctr., LLC,
2:18-cv-02741-JPM-cgc, ECF No. 52 (W.D. Tenn. May 2, 2019); Farwell
v. Quince Nursing and Rehab. Ctr., LLC, 2:18-cv-02795-JPM-dkv, ECF
No. 20 (W.D. Tenn. May 2, 2019)).  The Foley and Farwell orders that
Allenbrooke cites are brief orders granting motions to compel
arbitration.  The legal analysis in those orders is cursory.  The
Court found that valid arbitration agreements existed between
nursing facilities and representatives of decedent residents.  No
valid arbitration agreement exists in this case.  The Foley and
Farwell orders are not apposite.

prior to his admission to Allenbrooke" and to determine whether Charles's designated physician determined that Charles lacked capacity before or after December 7, 2018, the date on which Catherine signed the Agreement.  (See id.)

The FAA provides that, when a party moves to compel arbitration and there are genuine disputes of material fact about whether a valid arbitration agreement exists, the "court must proceed to a trial to resolve the question." Great Earth Cos., 288 F.3d at 889 (citing 9 U.S.C. § 4).  When there are genuine disputes of material fact about whether a valid arbitration agreement exists, courts sometimes allow limited discovery on those issues.  See, e.g., Foust v. Comcast Corp., No. 3:19-cv-173, 2020 WL 1891755, at *5-6 (E.D. Tenn. Jan. 28, 2020) (allowing limited discovery on issues related to arbitration "so that the Court [could] promptly rule on whether a valid arbitration agreement exists based on a complete record") (collecting cases).

Limited discovery is not warranted on the issues Allenbrooke raises.  There are no genuine disputes of material fact about whether there was a valid arbitration agreement between Allenbrooke and Charles or Catherine.  Allenbrooke asserts that limited discovery is warranted to resolve a dispute about whether Charles had capacity at the time Catherine signed the Agreement.  (ECF No. 29 at 7-8.)  Whether Charles had capacity when Catherine

signed the Agreement is not dispositive of whether Catherine had authority to enter into the Agreement on Charles's behalf as his health care surrogate under the THCDA. See McKey, 2008 WL 3833714, at *3 (decedent's daughter's concession that decedent was "incompetent at the time of [decedent's] admission" to nursing facility did not establish daughter's authority to act as decedent's health care surrogate under the THCDA, which "requires a determination by a physician that the patient lacks capacity"); Ricketts, 2008 WL 3833660, at *2 ("Even if we assume that [decedent] was not competent at the time that [decedent's daughter] signed [arbitration agreement on decedent's behalf], that fact does not make a difference in the result. [Decedent's daughter] must have some basis of authority."). There is not a genuine dispute of material fact about whether Catherine had authority to enter into the Agreement on Charles's behalf.

Allenbrooke asserts that limited discovery is warranted to resolve a dispute about when Dr. Nash, Charles's designated physician, determined that Charles lacked capacity. (ECF No. 29 at 7-8.) The record does not reflect a genuine dispute about that issue. The record shows that Dr. Nash determined that Charles lacked capacity on or around December 14, 2018, when she represented on the physician portion of the Appointment of Surrogate form that "I find that the Resident . . . lacks capacity." (ECF No. 15-3.) Catherine's affidavit, in which she

26

swears that "[n]o physician was present, and no physician signed the attached 'Appointment of Surrogate Form,' when I was presented with the stack of [Allenbrooke admission] documents to sign," and that, "[t]o my knowledge, Dr. Dana Nash never examined my husband prior to his admission to Allenbrooke on or about December 7, 2018," is in accord.   (ECF No. 21-1 ¶¶ 6, 9.) Allenbrooke has presented no evidence to the contrary.  There is not a genuine dispute of material fact about when Dr. Nash determined that Charles lacked capacity.  Limited discovery is not warranted on the issues Allenbrooke raises.

## V.   Conclusion

For the foregoing reasons, the Motion to Compel is DENIED.


So ordered this 17th day of September, 2020.


/s/ *Samuel H. Mays, Jr.*
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE